# IN THE COURT OF APPEALS OF IOWA

No. 3-1245 / 13-0183
Filed April 16, 2014

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**LEANDRO EDWIN VALDEZ,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Sioux County, James D. Scott, Judge.

Leandro Valdez appeals his convictions for first-degree robbery and first-degree burglary. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger and Tyler J. Buller, Assistant Attorneys General, Adam Kenworthy, Student Legal Intern, and Coleman McAllister, County Attorney, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**BOWER, J.**

Leandro Valdez appeals his convictions for first-degree robbery and first-degree burglary. He claims the State called his sister as a witness at trial solely to introduce inadmissible hearsay evidence in the guise of impeachment. Valdez also challenges the court's restitution order. We affirm his convictions, vacate the restitution order, and remand for further proceedings in accordance with this opinion.

## I. Background Facts and Proceedings

In August 2012 Valdez, age sixteen, lived with his mother Yolanda and younger sister A.G. in Orange City, Iowa. Douglas Hamming, who lives near Valdez, took a walk at 5:00 p.m. on August 30. Hamming saw four young males and two young females in Valdez's front yard. The young men were shooting at each other with toy guns. Hamming observed a black Explorer parked in the Valdez driveway.

Luciana Chamale, who moved to the United States from Guatemala, lived with his brother and cousin in Orange City. Chamale was known to wear necklaces or "chains." Chamale was home alone on the evening of August 30. At 10:00 p.m., Chamale locked the outside door, the door to his bedroom, and went to sleep. Around 11:30 p.m., the noise of five male intruders woke him. All five wore masks, and one had a gun. Two of the intruders spoke English, and three spoke Spanish—"the three Hispanics, they had knives."

The intruder carrying a gun kept Chamale in his bedroom while it and the other rooms were ransacked. A bulb hanging from the ceiling was the only light

source in Chamale's bedroom. One intruder asked Chamale, "Hey chiquillo, what about the chains?" When the intruder called him "chiquillo," Chamale believed the young man was "Yolanda's son." When this same intruder hit his head on the bedroom's light bulb, his mask slipped and revealed his face.

Yolanda called Chamale "chiquillo," a reference to a smaller person. Yolanda helped Chamale by translating for him, and Chamale testified he had never heard anyone else call him "chiquillo." Chamale also testified that on one occasion Valdez accompanied Yolanda when she came to Chamale's home to borrow money.

The intruders threatened Chamale after they had gathered cash, jewelry, his cell phone, and a television. Chamale escaped by running out the door. He fell and "tumbled down the steps." Three of the intruders caught up with him and beat him, causing cuts and bruises. Chamale ran to a neighbor's home.

At 11:54 p.m. on August 30, Hope Hancock called 911 because her Spanish-speaking neighbor had arrived—frightened, out of breath, and saying, "pistola." Hancock did not speak Spanish or know the neighbor's name but she referred to him as "little guy."

After the police arrived at Hancock's home, they accompanied Chamale back to his home. No one was there. Officers noted the damaged front door and took pictures. Officers found Chamale's cell phone and a flashlight nearby. Through an interpreter, Chamale stated he recognized Yolanda's son.

When officers arrived at Valdez's home around 2:30 a.m., Yolanda was just returning home from work. The officers observed folding chairs in a circle in

the front yard. Upon questioning, Valdez stated he had been home from school all day because he was sick. Valdez denied involvement in the incident.

Yolanda consented to a search of the home, and the officers found toy guns under Valdez's mattress. They also found a black Ford Explorer parked behind the garage in a location where vehicles were not commonly parked. One officer testified the vehicle "appeared to be hidden." The Explorer belonged to one of Valdez's friends, Tom Schuck. Valdez denied knowing why the car was there. Valdez told the officers he had no idea where Tom was and he had not seen Tom that day. Officers found black clothing and a knife inside the Explorer.

The officers showed the toy guns, knife, and clothing to Chamale. Chamale testified the toy guns—guns with an orange tip—were not the same as the real gun used in the robbery. Chamale stated the knife was the same style, but the intruders' knives had bigger blades. Chamale said the black clothes were not the clothes he saw, although the intruders wore black.

Seventeen-year-old Luis Guitierrez found a large television near a shed and told his father about it. This television had been stolen from Chamale's home. Guitierrez testified there are only four or five young Hispanic males living in Orange City.

At 6:00 a.m. the next day, Yolanda called the police after talking to her daughter, A.G. The responding officers took a statement from A.G., who wrote:

> It was around 11:00 and I was going to take a shower until I saw my brother putting strange things on his face like a bandana and a shirt. [H]e was wearing black sweatpants . . . and black hoodie. I asked what he was doing and he said nothing just going to chill and they all took off. He took off with E[J] Medina, Cesar Chavez, and To[m] Schnuck.

The State filed a trial information, later amended, charging Valdez with first-degree robbery and first-degree burglary. In November 2012 defense counsel took A.G.'s deposition. A.G. said that on August 30 she ate, did her homework, watched television, and took a shower before going to bed at 9:00 p.m. Her brother's friends, Cesar Chavez, E.J. Medina, and Tom Schuck came over around 7:00 p.m. to 8:00 p.m. Tom had his car. The boys, including her brother, kept coming in and out of the house. A.G. stated her brother went to sleep before she did. Because she was sleeping, A.G. did not know if her brother got up later in the evening. When A.G. was getting ready for bed, she saw the boys in her brother's bedroom. She explained:

> Q. Did you tell the police officers that they were putting some strange things on? A. Yes.
> Q. Tell me about that. A. Well, I saw them putting on, like, sweatshirts and changing into clothes. And I saw some of them, like wearing, like, bandannas, so . . . .
> Q. Are those the strange things that you are referring to? A. Yeah.
> . . . .
> Q. Have you seen Leo or his friends with bandannas before? A. No.
> Q. So that was—that was the first time you saw them with bandannas? A. Yes.
> Q. Any other strange thing that you saw or observed that evening? A. No.

A.G. stated she did not tell the officers that Valdez was wearing black sweatpants and a black hoodie. She did remember asking Valdez what he was doing. Now, she did not remember his answer.

After A.G. read her prior written statement, she admitted it differed from her deposition testimony and stated: "I'm just confused. I don't . . . because like I don't remember hardly anything anymore."

> Q. . . . [Y]ou did say that they took off, but now you are telling us that [Valdez] was asleep. Can you try and clear up the inconsistency. Which one is true, the report or what you are telling us today? A. What I'm telling you.
> Q. Are you saying this report is not correct? A. Yes.
> . . . .
> Q. Okay. So what has changed between then and now? A. If my brother did go or not, and the time, and what I was doing.

A.G. again explained that her brother was already asleep at 9:00 when she went to bed. The 11:00 time she had written earlier was not true.

The State questioned A.G. about the journal entry she brought with her to the deposition—she stated that when she was questioned previously she felt pressured and confused. She testified no one told her what to write on August 31. A.G. stated:

> Q. The statement I saw my brother putting strange things on his face, did the police pressure you into writing that? A. No.
> Q. Did you select the language? A. Yes.
> Q. And you put like a bandanna and a shirt. Is that what he was wearing? A. Yes.
> Q. That was true? A. Well, yes.
> Q. And the police didn't pressure you into saying that? A. No.
> Q. And black hoodie. How about that, was that true. A. No.

A.G. explained her phrase, "they all took off" meant her brother, Cesar, Tom, and E.J. kept going "in and out of the house. And sometimes it seemed like they were gone, but they came back, so I don't—I didn't know what to say." The police did not pressure her to write "they all took off."

Q. And who is "they" that walked out together? A. Cesar, Tom, E.J., and my brother, they just kept walking in and out.

Q. Okay. But somebody came back, you said at some point. That's your brother, right? A. Yes.

Q. And you don't know what time it was he came back? A. No.

Q. Could it have been after 11:00? A. I don't think it could.

Q. Why not? A. Because I don't go to bed that late.

. . . .

Q. Okay. So is it, [A.G.] that you don't remember what happened that night or you're changing your story? A. I don't remember what happened that night.

Q. And you wrote that statement a few hours after it happened, right? A. Yes.

Q. Did you remember things better back then? A. Not really, because I was half asleep.

Valdez filed a motion in limine claiming A.G. "totally recanted" her statements in the deposition. He requested the State be prevented from calling her as a witness under *State v. Turecek*, 456 N.W.2d 219 (Iowa 1990). The State resisted the motion and claimed if anything, only portions of the statement should be excluded. After a hearing, the court ruled: "State may not impeach this witness with substantive evidence which is otherwise inadmissible."

Trial to a jury commenced in early December 2012. Hope Hancock testified Chamale was out of breath and very scared when he arrived at her door. He "was trying to pull himself together." Chamale's brother testified "chiquillo" means a smaller person.

Chamale testified to seeing the "hooded" individuals, the pistol, and the knives. He recognized Valdez when he banged into the light and "his mask fell, and then he right away put it back on, and then he said to me, hey, chiquillo, what about the chains." Chamale explained he was wearing the three old chains or necklaces when he and Valdez would see each other at a store. Valdez had a

knife the evening of the robbery. "Q. Did you know it was [Valdez] because of the words he used or because you saw his face? A. From the two things because of the—his face and the words that he said to me." Police officers testified and confirmed that immediately after the incident, Chamale stated "Yolanda's son" was one of the intruders.

Before calling A.G. to the stand, the State made an offer of proof outside the presence of the jury. A.G. stated E.J. Medina, Tom Schuck, and Cesar Chavez came over after school. Her brother "was inside and outside," not sick in bed. She went to bed earlier than 11:00, around 9:00 or 10:00. A.G. did not know if her brother got out of bed after she went to sleep. She stated the boys were putting on sweatshirts but they did not put on bandannas. When confronted with her deposition statements about bandannas and about Valdez wearing black sweatpants, A.G. testified, "I don't remember," and stated reviewing the deposition would not refresh her memory. "Q. Are you saying what you said before was wrong, or are you just saying I don't remember? A. I'm saying that— I'm saying both." A.G. also stated the 11:00 shower time was wrong, it was "probably, like 8:00." Also, she did not remember her brother putting strange things on his face.

After the prosecutor's offer of proof, defense counsel read a long portion of A.G.'s deposition and asked, "So, I'm asking you again, was that statement that you wrote . . . false? A. Yes."

Before ruling, the court noted A.G. told defense counsel the written statement was false and told the prosecutor she can't remember: "How can I

make a ruling on that?" The State claimed A.G.'s inadmissible, recanted statements are the fact her brother was wearing a black hoodie, clearly recanted in her deposition, and the fact she took a shower earlier. The court ruled the State could call A.G. as a witness but could not question her "on the subjects of the black hoodie and the time of the shower."

The jury returned to the courtroom. The State followed the court's admonition. A.G. testified her brother had some friends over on August 30, Cesar Chavez, E.J. Medina, and Tom Schuck—"possibly around 5" after Yolanda had left for work. A.G. watched television and did her homework. She ate and took a shower. As to the boys, "[s]ometimes they went outside and stood on the—like the little step, and sometimes they'd come in and my brother would lay in his room and they'd just watch TV." When A.G. went to bed at 9:00, her brother was already in bed.

When A.G. denied the boys were putting on sweatshirts, defense counsel objected, and the court excused the jury. The court again ruled the State could not question A.G. about whether her brother wore a hoodie sweatshirt or the time she took a shower—"those were clearly recanted." But "as to the other individuals at the home and what they may or may not have been wearing, the witness had not "truly recanted," and the evidence was not otherwise inadmissible.

When A.G.'s testimony resumed, she stated she did not see the boys putting on sweatshirts but admitted, during her November deposition, she did state that. A.G. explained she did not understand what the prosecutor was

saying at the deposition and Valdez's friends "didn't put them on, but they were wearing some" but not black ones.

A.G. testified she did not see her brother put on or wear black sweatpants. A.G. admitted she had stated so in her deposition and in her written statement to police but stated now she does not remember. A.G. explained her memory was not better in her written statement because she was half asleep, "I don't think I would have remembered. I could have said anything." A.G. also stated she does not remember what she said before and she was confused—both.

A.G. admitted she told the police officers (1) about "strange things" on her brother's face, like a bandanna, (2) she asked her brother what he was doing, (3) her brother replied, nothing, just going to chill; and (4) all the boys took off. For each of these statements, A.G. testified she now does not remember if that is what happened.

Yolanda Valdez testified she did not borrow money from Chamale. Yolanda called Chamale "chiquillo" because others called him that—his family, co-workers, and mutual friends.

The jury returned a guilty verdict, and this appeal followed.

## II. Scope and Standards of Review

We review "all *Turecek* violations" for errors at law. *State v. Wixom*, 599 N.W.2d 481, 484 (Iowa Ct. App. 1999). Likewise, we review restitution orders for correction of errors at law. *State v. Driscoll*, 839 N.W.2d 188, 190 (Iowa 2013). We consider if the court has not properly applied the law. *Id.*

### III. *Turecek* Violation

Valdez claims the district court erred in allowing the State to call A.G. as a witness, and the court admitted inadmissible hearsay under the guise of impeachment. Valdez claims A.G. recanted her entire testimony and her written statement was a statement made by her, other than her testimony at trial, which the State offered to prove the truth of the matter asserted—inadmissible hearsay. Valdez argues: "During the offer of proof, [A.G.] said she was both recanting and could not remember and that her statement to the police was false. [A.G.] thereby recanted her statement."

Citing *State v. Sowder*, 394 N.W.2d 368, 371 (Iowa 1986), Valdez correctly notes a reviewing court "looks to the real purpose for the offered testimony, not just the purpose urged by the prosecution." Valdez claims A.G. was called simply to introduce her otherwise inadmissible, recanted written statement.

Any party can attack the credibility of a witness, no matter who called the witness to testify. Iowa R. Evid. 5.607. In *Turecek*, 456 N.W.2d at 225, the court qualified the State's right to impeach its own witnesses:

> The right given to the State to impeach its own witnesses . . . is to be used as a shield and not as a sword. The State is not entitled under rule [5.607] to place a witness on the stand who is expected to give unfavorable testimony and then, in the guise of impeachment, offer evidence which is otherwise inadmissible. To permit such bootstrapping frustrates the intended application of the exclusionary rules which rendered such evidence inadmissible on the State's case in chief.

In a later sexual abuse case, the court recognized the *Turecek* court condemned "prosecutorial maneuvering in which the State places a witness on

the stand who it expects to give unfavorable testimony solely for the purpose of introducing otherwise inadmissible evidence." *State v. Tracy*, 482 N.W.2d 675, 679 (Iowa 1992). Therefore:

> Given that the record clearly reveals that the State knew K.A. intended to retract the allegations of sexual abuse she had formerly made, we must assume the State orchestrated this series of events merely to place before the [jury] various items of evidence that would otherwise be inadmissible. As we concluded in *Turecek*, this sort of maneuvering constitutes reversible error.

*Id.*

Under the circumstances of this case, we conclude the district court did not err in allowing the State to question A.G. with specifically-identified limitations. A.G. was not called for the primary reason of impeaching her with prior inconsistent statements; she was called to provide testimony favorable to the State that no other witness could offer. A.G. testified she and her brother were home alone while their mother was working on the evening of August 30. She testified her brother's friends came to their home that day. Only A.G. could specifically identify the friends, and she testified they kept going in and out of the house. While Hamming testified to seeing Valdez in the yard with other young men, Hamming could only identify Valdez. Only A.G. could provide the names of the young men present in the Valdez home on the evening of August 30. Only A.G. could connect Valdez with Tom Schuch, the driver of the Explorer parked behind the Valdez home when the police arrived at 2:30 a.m.[1]

---

[1] Officer Van Voorst testified he knew Tom Schuch "typically drives that vehicle" and also knew Schuch hung out with Valdez. When Van Voorst "ran the plates," he learned the vehicle was registered to Tom Schuck's mother.

On this record, we do not conclude the prosecutor "orchestrated this series of events" primarily for an improper purpose. The prosecutor's "real purpose" for calling A.G. was for her to complete the story of the events of the evening as a fact witness. *See Sowder*, 394 N.W.2d at 371. The trial court allowed only limited testimony, and the State followed those limitations. Valdez is not entitled to a new trial.

## IV. Sentencing—Restitution

Restitution is authorized by statute and is a mandatory part of sentencing in Iowa. *State v. Mai*, 572 N.W.2d 168, 171 (Iowa Ct. App. 1997). The sentencing court is "expected to make a prompt resolution of sentencing issues." *Id.*; *see State v. Blakley*, 534 N.W.2d 645, 648 (Iowa 1995) (stating Iowa Code section 910.3 (1993) is the "legislature's way of ensuring that restitution is determined properly").

The State requested restitution for the costs of prosecution under Iowa Code section 815.13 (2011). The district court ordered Valdez to pay restitution for those costs under section 815.13. Valdez claims section 815.13 only provides for the recovery of prosecution costs for criminal actions under county or city ordinances. Thus, there is no statutory authorization for the district court's order. The State concedes the court erred in ordering the recovery of the costs of prosecution under section 815.13 and requests we remand to the district court. We so rule.

Valdez also points out Iowa Code section 356.7 allows the sheriff to recover the cost of housing a defendant if the defendant is eighteen or older.

The State concedes, under this section and because Valdez was not eighteen at the time of his detention, the court erred in ordering Valdez to pay detention costs as a part of the restitution order.  We so rule.

We affirm Valdez's convictions, vacate the restitution order, and remand for further proceedings in accordance with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**